## Casebolt et al. v. Kentucky-West Virginia Gas Co.

Feb. 9, 1943.

Clark Pratt and T. E. Moore, Jr., for appellants.

Combs and Combs for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming in part and reversing in part.

On April 17, 1922, Riley Casebolt executed a gas lease to Kentucky Coke Company, assignor to appellee, covering 862 acres of land, comprising four tracts. The lessee had drilled one well and assignee, by August 1934,

had drilled two others, all commercially producing. The lease, inherited by the widow and children, contained this clause:

"Lessor may, if any well or wells produce a surplus of gas over and above the amount required for operation of the premises by lessee, at his own risk, have gas for heat and lights, one for one family in each of the six houses on the said premises, paying for the connection at such points as may from time to time be designated by lessee, and using modern and economical appliances in consuming same."

After the first well was brought in, lessor and several of his married children living on the tract, laid service lines to their respective houses on the premises. Riley Casebolt died in May 1936, and in December 1938, appellee filed petition in equity making defendants the heirs and the administrator of Riley's estate, charging that during the lifetime of Riley, and thereafter, all within the last five years, parties in addition to using gas for lighting and heating had used it for open lights, under wash kettles, firing a steam mill, and other unauthorized purposes; that they had used gas with appliances which were not modern or economical, thus consuming much excess gas. The quantity charged to have been thus consumed and wasted by all, during the life of Riley and thereafter was fixed at more than 7,000,000 cubic feet, of the reasonable value of $960; calculation shows the rate applied to be about 12 cents per 1,000 cubic feet.

It was charged that defendants used gas in two extra houses for about two years without burners or modern appliances, the use over lessee's protest. Plaintiffs sought to recover the sum named and to enjoin the use of gas, in the two additional houses, and the occupants of the six houses from committing waste, and the use without installation of proper appliances.

This was followed by motion to make more definite by setting up the quantity of gas used and wasted during the lifetime of the father, and by others thereafter; the amount charged to have been wrongfully used for other than house purposes, etc. To this plaintiff responded that it did not know when Riley Casebolt died; that the greater portion of the gas wrongfully used and wasted during the entire time mentioned was measured through three separate meters, and except for such time as the

meters were out of repair, due to negligence of the defendants, quantities were shown by a schedule attached to its response.

This schedule headed in the name of Riley Casebolt undertook to show that there were measured through the three meters, from June 1934, the date they were set, to February 9, 1939, 12,291,000 cubic feet of gas. It responded that it did not know how much of, or how many days the defendants used gas for other than house heating and lighting, and since the gas was piped through three meters plaintiff could not tell the amount consumed and wasted by each defendant, but that they were all jointly and severally liable for wrongful use and waste under the lease.

Defendants answered, denying all allegations of the petition, and affirmatively pleading the terms of the "free use" clause of the original lease. They allege that at the time the wells were drilled, and when they began to use gas the plaintiffs set meters at each of the producing wells for the purpose of measuring gas to be, and as was used by defendants; that plaintiff had knowledge of the quantity of gas used by them, and was estopped because no complaint was ever made to the use. They said that all appliances were modern and economical; that after six houses had been connected, E. B. Hall and Lucy Salisbury obtained permission from plaintiffs to use gas in their dwellings under the free use clause, plaintiff assisting in installing connecting equipment, they expended $150 each in the installation process, and if the court should hold that they be not entitled to use of gas, they should recover the sums thus expended.

Plaintiff replied, denying affirmative allegations and as to the Hall Salisbury claim denied any agreement. In a final amendment which sums up, it is charged that from installation of meters in June 1934, to July 1940, there had been consumed, used, wasted and permitted to escape through leaky service pipes, 15,707,000 c. f.; that 6,000,000 feet was reasonably sufficient to heat and light the six houses, hence defendants were chargeable with the waste and wrongful use of 9,707,000 feet, at the reasonable market value of 35 cents per 1,000, a total of $3,397.45, which was asked to be adjudged, and that plaintiffs be entitled to disconnect, and defendants enjoined from further use until payment.

Pleadings were completed by rejoinder to so much of reply as raised the issue as to free use to Hall and Salisbury. Amended pleadings were controverted of record. Upon submission the court construed the lease to limit free use to six houses, and to require use of modern and economical equipment by the users. He also found that 150,000 feet of gas was a reasonable quantity to be consumed annually in each dwelling.

Specifically it was adjudged that from June 1934 to July 10, 1940, defendants had consumed and wasted 16,707,000 feet of gas; that of the quantity there was used between June of 1934 and May 1936, 3,030,000 feet, and that 1,800,000 was sufficient for proper use in the six dwellings, and that 1,230,000 feet were wasted or used in excess of the reasonably necessary quantity. That from May 1926 to June 1940 there was consumed and wasted 13,677,000 feet, and that 3,600,000 constituted reasonable quantity, hence 10,077,000 feet were wasted or used in excess of the reasonable amount, making a grand total of gas wasted or excessively used from June 1934 to July 1940, 11,307,000 feet.

He held the prevailing price to consumers by retail in the vicinity to be 35 cents per 1,000 cubic feet, and applying that rate found the sum to be due for the entire period, $3,957.45, but gave judgment for $3,397.45, since plaintiffs had in petition limited the amount to be recovered at the latter figures. This was adjudged against the heirs and the administrator; $2,966.95 against the heirs and $430.50 against the administrator.

It was further adjudged that plaintiffs should have execution or other process to enforce collection sixty days thereafter, unless judgment be not satisfied in the meantime; after the expiration of said sixty days plaintiffs should have the right to disconnect service lines, or cease to furnish gas until judgment be satisfied, and defendants were enjoined from interference with plaintiffs in disconnecting lines, and from reconnecting (if disconnection be made) until the judgment be satisfied.

As to Hall and Salisbury, the court adjudged that they had no right under the lease to free use; they were directed to forthwith disconnect their service lines from plaintiffs' mains, and were enjoined from taking or using gas from the mains. It was also adjudged that "hereafter defendants or those claiming under them

shall be entitled to use 900,000 cubic feet of free gas per year. We take up first the Hall-Salisbury phase. These two were heirs of Riley Casebolt. Some time early in 1937 or 1938, no better date fixed, they "tied on" to the mains. They talked to employees of the company both before and after connection. Their argument was that they were as much entitled to free gas as were the other heirs. They were told that the lease only provided free use to six houses, and that plaintiff would "shut all them off if more tied on." The chief field agent tried to get the heirs to agree to 1,200,000 feet of gas the (proposed) lease provided for, and split it eight ways. A contract was submitted with this proposal. Those who were approached would not agree, and "they just went ahead and took it." It was proposed that the company set meters for Hall and Salisbury, "and the others would pay their part, and then that blew up." Mrs. Salisbury says she was told that only six houses could use free gas, and "I told them I would buy gas and they said all right."

E. B. Hall talked to the field agent; asked him if it could be worked out so he could get free gas. He was reminded of the six house limit, and he then told the agent he thought it could be worked out if the heirs signed an agreement, the "best I remember about 200,000 feet per year." They then proceeded to tap the main.

From all the proof it is clear that appellees had knowledge of the use of gas by Hall and Salisbury. In fact in February 1938, the field agent wrote to parties, except Hall and Salisbury, that eight persons were using gas from the wells on lease 42, calling attention to the free use clause and suggested that if it was the desire to continue the use for eight houses, "we will be able to work out an amendment to the lease, allowing a specific amount of gas to each consumer, otherwise the use would be confined to six houses." No such "amendment" was worked out, and one of the heirs, upon receipt of his letter, said that he understood (though doubtful) from the extra tenants that they had made satisfactory arrangements with the company, and further advising "that it is your duty and not the duty of the heirs to see that something is done about this without further dispute. They may be disconnected, or meters may be installed so that they may pay for the gas." Nothing was done until the filing of the suit.

Counsel for appellants contend that their rights to

free use depends upon the portion of the original lease above quoted, and mildly insists that they were entitled to all the gas they might use, the situation differing in respect to free use with which we dealt in Warfield Natural Gas Co. v. Small, 282 Ky. 347, 138 S. W. (2d) 488, and Warfield Natural Gas Co. v. Jude, 261 Ky. 113, 87 S. W. (2d) 108. The only difference is that in those cases there was a written application for use of gas, which the court held to be a contract for free gas, supplemental to the clause in the original lease. It is true the clause in the present lease was silent as to the free quantity or the price to be charged for excess or as to rights of parties if lessors should use more gas than necessary to light and heat six houses, using modern and economical appliances; the court correctly construed the contract on the points of free and excessive uses.

It is also argued that an agreement between Riley Casebolt and appellee was entered into supplementing the original lease, under which all differences between them were settled, including argument as to excessive use of gas. We have examined that document and it related only to a claim of additional or more prompt development and a doubt as to whether the lease embraced some particular parcels of land.

There was no mention of excessive use of wasting of gas, though there is some extrinsic proof that these matters were discussed. However this may be, and the complaint that much of the proof related to excessive use or waste prior to Riley Casebolt's death, the pleadings and the court's judgment confined the recovery to matters arising after the installation of meters, in June 1934.

It is complained that the amended petition charged wasting by leakage, when the original made no claims for leakage by negligence in use of leaking service pipes. This is true, but the amendment simply enlarged on the manner whereby the excess occurred. It is also true that in the original petition the recovery was based on a charge of 12 cents per cubic foot. This was raised in the amendment to 35 cents per foot, which as a matter of pleading was allowable.

The appellants here were at a decided disadvantage in meeting the proof as to the quantity of gas going through the meters into the service pipes. There is some evidence which shows that all the parties did not install

or maintain modern equipment prior to some time in 1937 or 1938, and some that service lines were not laid in a proper way; that in several instances the regulators were weighted down so as to increase the flow of gas. There is some proof, though not much, of the use of gas after June 1934, in operating engines, or in open fires outside the houses.

It would require too much space and time to recount the testimony adduced, but it is sufficient to say that there was enough proof to justify the court in finding that there had been an excessive use and some waste each year, and if we accept the conclusion that each consumer was reasonably entitled to the use of 150,000 cubic feet per year, there is little room for dispute as to the quantity found by the court. However, it seems to us that the judgment was rather harsh; this is said because of the impression gained from a reading of appellee's proof, particularly that of the chief field agent, that the company was undertaking more to establish its rights under the use clause than to demand its pound of flesh. This witness testified that in the particular field the quantity allowed consumer under free use provisions, varied from 125,000 to 200,-000 cubic feet per home per year, and said that Warfield's leases provide for 200,000 feet per year, "and our printed forms provide for 150,000, and in most of our leases when free gas is allowed we change it to read for 200,000 feet."

Again he said, while he thought the houses here involved could be taken care of with 100,000 feet per year, he "would say 200,000 feet to make it more liberal." With this fair estimate fixed by the highest officer testifying, in view of the facts and the disadvantageous position of appellees, we think the chancellor would be justified in allowing 200,000 cubic feet per year to one family in each of six houses. The matter of gas to Hall and Salisbury, of course, will have to be worked out some other way, either by direct contract with appellee, or an amended free use clause in the lease, in which latter case the limit may be fixed agreeably by contracting parties.

There is great doubt in our minds whether or not the appellees should be allowed to recover for gas leaking from the service pipes; while it is shown by the proof that there were frequent leaks, with demands on consumers for repair, Mr. Clark said that when leaks

were discovered the company would try to get the user to repair "and then as a usual case if he would not then we would, that is the usual procedure." What allowance should or might be made in this repect we have no means of determining.

However, appellee's proof shows that appliances used by defendants in and after 1938 were fairly modern and economical, with some minor exceptions, although there may yet have been some excessive use. But as we read the proof of appellee a great part of waste must have been due to leaks in service pipes, of which appellee had knowledge. In the judgment the court included an overplus of 1,756,000 feet between the date of the suit and July 10, 1940. It is not difficult to conceive that the greater portion of the quantity named was due to leakage. This total, unless there can be estimate adjustment, should be eliminated.

Taking up now the complaint of excessive charge for gas wasted or used in excess, under all the facts and circumstances developed, we are of the opinion that notwithstanding there was proof which might have justified the adoption of the 35 cents per 1,000 cubic feet for such, the chancellor should have fixed the price at 12 cents per 1,000 feet. The only testimony as to matter of price was by Mr. Clark. He testified that the wholesale price prevailing in the particular field was from 10 to 12 cents per 1,000 feet. "The retail value for consumption is 35 cents per thousand where we install meters and sell gas to some families over the field." He said the 35 cents per thousand was to persons for domestic purposes furnished by gas companies who do not have free gas, though there might be variations.

It is unnecessary to enter into any discussion as to the technical meaning of the words "wholesale" or "retail" used by Mr. Clark as applied in the ordinary channels of commerce. These tenants were, of course, ultimate consumers, but for the purposes here only, and in attempting to apply equitable and just rules and reasonings, we may accept the definitions of the words as adopted and applied in Kentucky Consumers' Oil Company v. Commonwealth, 192 Ky. 437, 233 S. W. 892, 893. There, after giving the lexicographer's definitions as ordinarily used, we said:

"There is a well-defined and clearly understood dis-

tinction between the words 'retail' and 'wholesale'; they are used in opposition one to the other, one being a sale in large quantities, the other in small quantities. Whether the sale is one by retail or wholesale will depend upon the facts of the particular transaction.''

Under the proof, and in view of the fact that appellee was uncertain whether it should fix the higher or lower rate, the lower rate should prevail, since here there was a sale in quite a large quantity, the company having nothing to do save install and read its meters at such times it chose, both acts being for its benefit in seeing merely that no excess use was indulged. The conclusions reached, as we have indicated, calls for a modification of the judgment to the extent that the chancellor should, in arriving at the amount recoverable, allocated as was done, allow under the free use clause a maximum of 200,000 cubic feet of gas per year to the occupants of each of six houses on the leased premises, the recovery then to be based on rate not to exceed 12 cents per 1,000 cubic feet.

We find no ground for disturbing that portion of the judgment which gives the right to appellees to cease the furnishing of gas to the six original occupants upon failure to satisfy the judgment to be entered, (Small case, supra) nor as to that part of the judgment in respect of plaintiff's right with relation to the two tenants, Hall and Salisbury, and such portion is affirmed, but reversed in part with directions to enter judgment consistent with this opinion; each party to pay one-half the costs to be taxed in this court.

Affirmed in part; reversed in part.